## The St. Paul Companies *vs.* TIG Premier Insurance Company.

No. 01-P-532.

Suffolk. January 22, 2003. - July 30, 2003.

Present: DOERFER, KASS, & McHUGH, JJ.

*Workers' Compensation Act,* Exhaustion of administrative remedies, Uninsured employer, Reimbursement of insurer. *Statute,* Construction.

This court concluded that the failure of a general contractor's workers' compensation insurer to exhaust the procedure for administrative review established by G. L. c. 152 barred its claims in Superior Court seeking reimbursement from another insurer for payments made to a subcontractor's injured employee [653-655], and that the provisions of G. L. c. 152, § 18, which require a general contractor's workers' compensation insurer to make workers' compensation payments to injured employees of uninsured subcontractors, did not provide an independent judicial forum for resolution of such a claim and, consequently, did not provide a mechanism for avoiding the exhaustion requirement [655-657].

CIVIL ACTION commenced in the Superior Court Department on May 18, 1998.

The case was heard by *Charles F. Barrett,* J., on motions for summary judgment.

*Owen Gallagher* (*Kara Larzelere* with him) for the plaintiff.

*Bret A. Cohen* (*Michael L. Cornell* with him) for the defendant.

McHUGH, J. The St. Paul Companies (St. Paul), the plaintiff here, is a workers' compensation insurer who paid the claim of an injured employee and then discovered information suggesting that, from the outset, the claim had been the responsibility of the defendant, TIG Premier Insurance Company (TIG), another workers' compensation insurer. St. Paul brought an action in Superior Court against TIG to recover the amounts St. Paul had paid. On cross motions for summary judgment, a

58 Mass. App. Ct. 650 (2003)                     651

The St. Paul Insurance Companies *v.* TIG Premier Insurance Company.

judge dismissed the complaint because of St. Paul's failure to exhaust administrative remedies. St. Paul appeals, and we affirm.

The case arises in the following setting. In the summer of 1995, Paul J. Rogan Company (Rogan) was the general contractor on a construction project in South Boston. St. Paul was Rogan's workers' compensation insurer. One of Rogan's subcontractors was Adgreene Company, Inc. (Adgreene). On June 22, 1995, TIG issued a workers' compensation policy to Adgreene with a term beginning June 22, 1995, and ending June 22, 1996.

Evidently, Adgreene did not pay its insurance premiums. Consequently, on July 26, 1995, TIG prepared a notice that Adgreene's policy would be canceled effective August 7, 1995. TIG sent that notice, inter alia, to the Workers' Compensation Rating and Inspection Bureau (WCRIB). It is undisputed that WCRIB received the notice on July 31, 1995, a date that became material later on.

On August 8, 1995, the day after TIG purported to end its coverage, Edward Kelly, an Adgreene employee, was injured while working at the site.[1] Kelly thereafter filed a claim for workers' compensation benefits. In his notice of claim, Kelly said that he was employed by Adgreene, that Adgreene was uninsured, and that, as a consequence, he was covered under the policy St. Paul had issued to Rogan.[2] See G. L. c. 152, § 18. In response, St. Paul filed a claim denial in which it said, among other things, that TIG had insured Adgreene at the time of the accident and therefore was responsible for any workers' compensation payments to which Kelly was entitled.

With issues joined in that fashion, the matter proceeded to a conference before an administrative judge at the Department of Industrial Accidents (department) held on January 22, 1996, pursuant to G. L. c. 152, §§ 7, 10A. At the end of the conference, the administrative judge ordered St. Paul to make workers' compensation payments to Kelly. St. Paul did so but moved

---

[1]It appears that Kelly also had been injured on the job on May 29, 1995. The view we take of the matter makes the earlier injury irrelevant.

[2]Actually, the claim said that United States Fidelity & Guarantee Company (USF&G) had issued the relevant policy. At least for purposes of this litigation, however, it is undisputed that USF&G was St. Paul's predecessor and that St. Paul inherited any obligations to Kelly that USF&G may have had.

to join TIG as a party to the proceeding. The motion was allowed. TIG then filed a notice of claim denial, along with a motion to dismiss the proceedings against it, on grounds that it had canceled the Adgreene policy effective August 7, 1995. TIG attached a copy of its cancellation notice to its motion to dismiss. St. Paul filed no opposition to TIG's motion and, in due course, the motion was allowed. St. Paul took no administrative appeal from the dismissal order. Ultimately, St. Paul effected a lump sum settlement of Kelly's claim in July, 1998, and paid Kelly the settlement amount.

At some point and in some way the record does not disclose, St. Paul learned that WCRIB had received TIG's cancellation notice on July 31, 1995. St. Paul, then represented by different counsel, interpreted a section of the workers' compensation statute as prohibiting cancellation of a workers' compensation policy until ten days after WCRIB's actual receipt of a copy of the insurer's cancellation notice.[3] St. Paul's interpretation of the statute meant that the TIG policy remained in effect on August 8, 1995, the date of Kelly's injury.

Fueled by that interpretation of the statute, St. Paul commenced an action on May 18, 1998, against TIG in Superior Court seeking declaratory relief, indemnity for the amount it had paid Kelly in settlement of his claim, and damages under G. L. c. 93A, § 11, for what St. Paul contended was TIG's unfair and deceptive denial, during the administrative proceedings, that its policy had been in effect on the date of Kelly's accident. TIG responded with a motion for summary judgment seeking dismissal of St. Paul's complaint because of what TIG claimed was St. Paul's failure to exhaust administrative

---

[3]St. Paul relied specifically on the following portion of G. L. c. 152, § 63, as amended through St. 1991, c. 132, § 1: "[A worker's compensation policy] shall not be canceled . . . until ten days after written notice of such cancellation . . . is given to the [WCRIB] or until a notice has been received by [the WCRIB] that the employer has secured insurance from another insurance company or has otherwise insured the payment of compensation provided for by this chapter." We need not, and do not, determine whether St. Paul's interpretation is correct or whether the propriety of that interpretation was, in the first instance, for the department. Compare, e.g., *Casey* v. *Massachusetts Elec. Co.*, 392 Mass. 876, 879-880 (1984), with, e.g., *City Council of Agawam* v. *Energy Facilities Siting Bd.*, 437 Mass. 821, 828 (2002).

remedies. The motion judge agreed with TIG and allowed its motion. Judgment of dismissal soon followed.

In our view, exhaustion was required and St. Paul's failure to pursue available administrative remedies barred its claim in Superior Court. Indeed, this case is controlled by our decision in *Utica Mut. Ins. Co.* v. *Liberty Mut. Ins. Co.*, 19 Mass. App. Ct. 262 (1985) (*Utica*). There, an injured employee filed a workers' compensation claim and the plaintiff insurer, Utica, believing that its policy had been in effect at the time the injury occurred, began making compensation payments. Utica later discovered evidence suggesting that the policy of the defendant insurer, Liberty, had been effective at the relevant time. Accordingly, Utica asked Liberty to begin making compensation payments and to reimburse Utica for the payments it had made to that point. Liberty refused. Upon receipt of the refusal, Utica utilized G. L. c. 152, § 7, as then existing, to obtain a conference before a single member of what then was called the Industrial Accident Board (board).[4] There, Utica sought an order permitting discontinuance of its payments and requiring Liberty to assume them. The single member denied Utica's request. At that point, Utica filed a complaint against Liberty in Superior Court seeking a declaration that Liberty was required to reimburse it for the payments it had made.

The Superior Court issued the declaration Utica sought.[5] We reversed, holding that "[t]he Superior Court should not have decided the merits of the case because, at the time Utica brought its action, there were available to it remedies within the administrative scheme established by G. L. c. 152 which Utica had neglected to pursue." *Utica*, 19 Mass. App. Ct. at 264. Specifically pointing to the provisions of G. L. c. 152, § 15A, which provide "a procedure for resolution by the board of controversies between insurers as to which is liable to pay a claim," *Utica, supra* at 265, we noted that "[t]he requirement

---

[4]Post-*Utica* changes of substance and nomenclature effected by St. 1985, c. 572, do not affect our analysis.

[5]At the time Utica filed its complaint, it was continuing to make compensation payments. Before judgment entered in the Superior Court, however, Utica and the injured employee entered a lump sum settlement. The Superior Court judgment declared that Utica was entitled to recover the settlement amount from Liberty.

654                           58 Mass. App. Ct. 650 (2003)

The St. Paul Insurance Companies *v.* TIG Premier Insurance Company.

of exhaustion of administrative remedies . . . [is] 'a sound principle of law and jurisprudence aimed at preserving the integrity of both the administrative and judicial processes.' " *Id.* at 264, quoting from *Assuncao's Case*, 372 Mass. 6, 8 (1977). See generally *Trust Ins. Co.* v. *Commissioner of Ins.*, 48 Mass. App. Ct. 617, 624 (2000).

There is no principled and material distinction between this case and *Utica*. After receiving an unfavorable ruling from the administrative judge, St. Paul, like Liberty, elected to forgo the entire administrative appellate process and to commence an action in Superior Court. Although St. Paul claims that it did not learn of the date on which WCRIB received TIG's cancellation notice until after the administrative appeal period had ended, it points to nothing that prevented it from discovering that date earlier.[6] Moreover, even if something truly did impede its ability to learn of the date earlier, St. Paul points to nothing that would have prevented it from seeking a discontinuance of payments and a reimbursement order from the department upon obtaining the information it needed. See *Johnson's Case*, 242 Mass. 489, 495-496 (1922); *Vouniseas's Case*, 3 Mass. App. Ct. 133, 139-140 (1975); G. L. c. 152, §§ 8, 10(1); 452 Code Mass. Regs. §§ 1.04, 1.07 (1993) (dealing with termination of payments based on "newly discovered evidence").[7]

Equally unpersuasive is St. Paul's assertion that it had no choice but to file an action in Superior Court because the department had no jurisdiction over its claim under G. L. c. 93A. Assuming the viability of such a claim[8] and the need to file a complaint before the administrative proceedings ended, the

---

[6]On its face, TIG's cancellation notice might have provoked some curiosity about the date WCRIB received it. The notice states that it was prepared on July 26, 1995, a Wednesday, apparently at TIG's administrative office in Irving, Texas. Given the looming weekend, timely notice, under St. Paul's theory of timeliness, was possible only if WCRIB received the notice on Friday, July 28, 1995. That was a tight timetable.

[7]St. Paul's citation of the one-year limit on filing a petition to take a late administrative appeal has no impact on a new complaint for termination of benefit payments.

[8]We offer no view on whether application of G. L. c. 93A to claims by one insurer that another has unfairly failed to assume responsibility for making compensation payments is "compatible with the objectives and enforcement mechanisms" found in G. L. c. 152. See *Whitehall Co. Ltd.* v. *Merrimack Val-*

proper course would have been to seek a stay so that the administrative process could run its course. See *J. & J. Enterprises, Inc.* v. *Martignetti*, 369 Mass. 535, 540 (1976).

Finally, we are unpersuaded by St Paul's claim that exhaustion was unnecessary because G. L. c. 152, § 18, provides an independent judicial mechanism for a general contractor's insurer to recover from a subcontractor's insurer compensation payments the former claims to have made in error. In essence, § 18 requires a general contractor's insurer, like St. Paul, to make workers' compensation payments to the employees of uninsured subcontractors who are injured while performing subcontracted work. After imposing that obligation, § 18 goes on to provide that the insurer who makes the payments

> "shall be entitled to recover indemnity from any other person who would have been liable to [the injured employee] independently of this section; and if the insurer has paid compensation under this section, it may enforce, in the name of the employee or in its own name and for its benefit, the liability of such other person. The insurer shall also be entitled to recover from the . . . uninsured sub-contractor all compensation benefits and expenses, medical, hospital or otherwise, that it has paid or may become obligated to pay on account of any injury to the employee . . . ."

G. L. c. 152, § 18, as amended by St. 1939, c. 93.

On its face and in isolation, § 18 might be read to allow the kind of action St. Paul brought here, for, if the TIG policy had been in effect at the time of Kelly's accident, TIG "would have been liable to [Kelly] independently of" § 18 itself. Even in isolation, though, that reading is labored. The section nowhere mentions an insurer's recovery from another insurer. That is an odd omission, if the intent were to include insurers, in a statute where references to "insurers" proliferate. More importantly, the entire section is premised on the nonexistence of a second insurer. See *Bindbeutel* v. *L. D. Willcutt & Sons Co.*, 244 Mass.

---

ley Distrib. Co., 56 Mass. App. Ct. 853, 858 (2002). See generally *Murphy's Case*, 53 Mass. App. Ct. 424, 426 (2001).

195, 198 (1923) ("[S]ection 17[9] was enacted, making the general contractor liable under the [workers' compensation statute] to the employees of the subcontractor, in case the latter did not insure his employees as provided by the statute"). Cf. *Cannon* v. *Crowley*, 318 Mass. 373, 375 (1945) ("The purpose of the section is to prevent [an] employer from escaping the obligation of the compensation act by letting out a part of his work to irresponsible subcontractors or independent contractors"). Read with that premise in mind, the quoted portions of § 18 appear designed simply to give an insurer who pays an employee of the insured's subcontractor rights comparable to those the insurer has upon payment to the insured's own employee. See G. L. c. 152, § 15.

St. Paul's labored reading of § 18 becomes even more dubious when that section is read, not in isolation, but in the context of G. L. c. 152, § 15A, a provision specifically aimed at resolving claims of competing insurers like the claim here.[10] Section 15A, as amended through St. 1955, c. 174, provides that when an injured employee files a claim "and two or more insurers, any one of which may be held to be liable to pay compensation therefor," agree that the employee is entitled to compensation but disagree as to which insurer is responsible for payment, either the insurers may agree on which of them will begin payments or a single member of the board will select one of them to do so. Having in that fashion seen to protection of the injured employee, the board then decides which insurer is in fact responsible for the payments and, if necessary, requires the responsible insurer to repay the amounts another insurer has paid. If the potentially liable insurers cannot agree that compensation is owed, then § 15A requires a prompt administrative hearing both on the question of liability and on the question of which insurer is responsible for making payments.[11] In sum, § 15A provides specific administra-

---

[9]Referring to St. 1911, c. 751, Part III, § 17, which was codified as G. L. c. 152, § 18.

[10]Although § 15A often applies when successive injuries to a single employee implicate successive insurers, see, e.g., *Borstel's Case*, 307 Mass. 24, 27 (1940), neither the language of the statute nor any decided case limits its application to that kind of case.

[11]Ancillary to its powers and obligations under § 15A, the department also has the power to enforce payment orders and sanction frivolous defenses with

tive procedures for resolution of disputes like the dispute at issue here.

To accept St. Paul's argument that § 18 provides a judicial mechanism for resolving the disputes § 15A specifically addresses would require us to conclude that the Legislature set up a tightly woven scheme for administrative resolution of all disputes arising out of the workers' compensation process but, at the same time, told insurers claiming to have made excess or mistaken payments that they could, if they chose, ignore the whole scheme and compel resolution of their claim in an entirely different manner. That makes little sense. Instead, statutory "interpretation[] must remain faithful to the purpose and construction of the statute as a whole." *Heritage Jeep-Eagle, Inc.* v. *Chrysler Corp.*, 39 Mass. App. Ct. 254, 258 (1995). Put another way, "a statute should be read as a whole to produce an internal consistency." *Telesetsky* v. *Wight*, 395 Mass. 868, 873 (1985). In achieving that internal consistency, "general statutory language must yield to that which is more specific." *Risk Mgmt. Foundation of the Harvard Med. Insts.* v. *Commissioner of Ins.*, 407 Mass. 498, 505 (1990). Overall, "[w]e interpret a statute consistent with the legislative intent and in order to effectuate the purpose of its framers." *Baccanti* v. *Morton*, 434 Mass. 787, 794 (2001). Those principles, when applied to the content of § 18 and its existence in proximity to § 15A, lead us to conclude that § 18 does not provide an independent judicial forum for resolution of the claims of competing insurers and, consequently, provides no mechanism for avoiding the requirement for exhaustion of administrative procedures designed to resolve claims like the one St. Paul has made here. The judgment of dismissal is affirmed.[12]

*So ordered.*

monetary penalties, G. L. c. 152, §§ 8(1), 14(1)(*a*), and to award multiple attorneys' fees for asserting or defending claims without reasonable grounds for doing so. See generally *Murphy's Case*, 53 Mass. App. Ct. 424, 426 (2001).

[12]"When a complaint requests declaratory relief, the court should ordinarily declare the rights of the parties, rather than dismiss the action." *Mangano* v. *Wilmington*, 51 Mass. App. Ct. 857, 861 (2001). Dismissal is nevertheless proper in cases like this one where failure to exhaust administrative remedies meant that St. Paul had no right to seek declaratory relief. See *Utica Mut. Ins. Co.* v. *Liberty Mut. Ins. Co.*, 19 Mass. App. Ct. at 269.