COMMONWEALTH VS. CLEALAND B. BLAIR & another.[1]

No. 01-P-1016.

Suffolk. January 14, 2003. - April 2, 2004.

Present: LENK, CYPHER, & MILLS, JJ.

*Watershed Protection Act. Statute,* Construction, Validity. *Constitutional Law,* Taking of property, Environmental protection. *Due Process of Law,* Taking of property. *Laches.*

This court concluded that the claim of the defendants in an action to enforce the Watershed Protection Act (act), St. 1992, c. 36, codified in part at G. L. c. 92, § 104, 107A (as in effect prior to July 1, 2003), that the act as applied to them constituted a taking under the United States Constitution, was not ripe for adjudication, where the Metropolitan District Commission had not made a final determination, on a variance application, of the extent of the alterations that it would allow to the lawn and beach areas of the defendants' property, which abutted a surface water (a pond) located within a watershed [745-748]; likewise, the defendants' claim that the act effected a categorical taking under art. 10 of the Massachusetts Declaration of Rights was not ripe, due to the defendants' failure to utilize the variance provision in the act [748-749].
The Watershed Protection Act, St. 1992, c. 36, codified in part at G. L. c. 92, § 104, 107A (as in effect prior to July 1, 2003), did not violate art. 49 of the Amendments to the Massachusetts Constitution, and the Commonwealth was not required to seek to protect the public interest in environmental quality only by means of acquiring property interests, rather than through regulation that stops short of being a taking under the Federal or State Constitutions. [750-751]
There was no merit to the argument by the defendants in an action by the Commonwealth to enforce the Watershed Protection Act (act), St. 1992, c. 36, codified in part at G. L. c. 92, § 104, 107A (as in effect prior to July 1, 2003), that the equitable doctrine of laches barred the action, where laches would not serve as a bar where a public right was to be enforced, and where the defendants had not met their burden of demonstrating that they had been unduly prejudiced by the Commonwealth's timing in bringing the enforcement action. [751-752]

CIVIL ACTION commenced in the Superior Court Department on May 29, 1998.

[1]Nancy J. Blair.

The case was heard by *Charles F. Barrett*, J., on motions for summary judgment.

*George P. Kiritsy* for the defendants.

*Edward G. Bohlen*, Assistant Attorney General, for the Commonwealth.

MILLS, J. This case concerns the enforcement of the Watershed Protection Act (act), St. 1992, c. 36, codified in part at G. L. c. 92, §§ 104 and 107A (as in effect prior to July 1, 2003, the effective date of St. 2003, c. 26, §§ 289 and 290, which repealed the act and inserted the Watershed Management Act, G. L. c. 92A½. See St. 2003, c. 26, § 715).[2,3]

Upon the Commonwealth's complaint that Clealand B. Blair and Nancy J. Blair (the Blairs) had violated the act by altering the beach and lawn of their waterfront property, the Blairs defended, in part, by claiming that the act was invalid under the Federal and State Constitutions. On cross motions for summary judgment, a Superior Court judge ruled the act constitutional, facially and as applied to the Blairs' property, and determined that no taking had occurred. He ordered the Blairs to restore the altered shorefront.

1. *Factual background.* In 1977, the Blairs purchased the property at issue, a lot on Demond Pond (locus), in the town of Rutland. When they purchased it, the only improvements were a "camp house," some lawn, and a beach area. For approximately seventeen years the Blairs used the property for recreational purposes. In September, 1994, they applied to the town for

[2]The substantive provisions of the act at issue here remain unchanged in G. L. c. 92A½. Only the administrative structure has been changed: rather than being administered by the Metropolitan District Commission (MDC or agency), the Watershed Management Act is now to be administered by the Department of Conservation and Recreation. See St. 2003, c. 41, § 1(7), transferring the functions of the division of watershed management in the MDC to the division of water supply protection in the Department of Conservation and Recreation.

[3]See part 2, *infra*. The act defines the protected watersheds as "the natural basin from within which water drains or in natural course would drain into the Quabbin reservoir, the Wachusett reservoir, or the Ware river upstream of the Ware river intake," G. L. c. 92, § 104, and, inter alia, prohibits "[a]ny alteration . . . within those portions of the watersheds that lie within two hundred feet of the bank of a tributary or surface waters or within four hundred feet of the bank of a reservoir." G. L. c. 92, § 107A(*a*).

permits to demolish the camp house and build a new house. The permits issued, and the new house was built. In June, 1995, desiring to expand the existing lawn and beach areas, they filed a notice of intent with the Rutland Conservation Commission (RCC), seeking an order of conditions authorizing the work. See G. L. c. 131, § 40. On July 18, 1995, the RCC issued an order authorizing the expansion work on the existing lawn and beach.[4] Between July, 1995, and July, 1997, the Blairs performed work on their property, including enlarging the lawn; enlarging the shoreline opening of the beach from approximately sixty feet to 120 feet; clearing trees and other vegetation from the shorefront area; excavating, filling, and grading sand and soil, including the removal of twelve inches of topsoil from the beach area; placing twelve additional inches of sand on the beach; building a retaining wall seventy-five to eighty-five feet long and at least thirty inches in height; and placing a three-foot wide, eighty-foot long brick walkway through the lawn area. The Blairs never sought a variance from the requirements of the act.

The water from Demond Pond flows into the Ware River and, through the river, into the Quabbin Reservoir, a major source of drinking water for the greater Boston area. We shall note other facts as necessary.

2. *Statutory and regulatory framework.* The act prohibits "alteration[s]" within 200 feet of the bank of a "surface water[]" in designated "watersheds." G. L. c. 92, § 107A(*a*). The act defines alterations to include "excavating, filling or grading" or "changing of run-off characteristics." G. L. c. 92, § 104. The act exempts construction of a single family dwelling on a pre-existing lot, but provides that "[w]herever possible there shall be no alterations within the area regulated." G. L. c. 92, § 107A(*h*). The act also exempts extensions to structures lawfully existing in 1992, provided those extensions do not substantially change or enlarge the structure or "degrade the quality of the water in the watershed." G. L. c. 92, § 107A(*c*).

---

[4]The order expressly stated, "This order does not relieve the permittee or any other person of the necessity of complying with all other applicable federal, state or local statutes, ordinances, by-laws or regulations."

The act contains provisions by which the landowner can request, and the Metropolitan District Commission (MDC or agency) can issue, a variance "from the provisions of [§ 107A]." G. L. c. 92, § 107A(*l*).[5] The agency is directed to enforce the provisions of the act (see G. L. c. 92, § 110) and, after consultation with the Department of Environmental Protection, to issue regulations, which appear at 350 Code Mass. Regs. §§ 11.00 et seq. (1994) (regulations). G. L. c. 92, § 108.

3. *The enforcement action, defenses, and counterclaims.* In a relatively simple complaint, the Commonwealth alleged that the Blairs violated the act by making alterations within the watershed, and requested a restoration order. As relevant to this appeal, the Blairs, by answer, affirmative defenses, and counterclaim, asserted that: (1) the alteration of the locus was exempt under the statute; (2) the Commonwealth's action was barred by laches; and (3) the act and regulations were void for vagueness and were unconstitutional under both Federal and State Constitutions because they effected a taking of private property without just compensation. The Blairs sought damages and a declaration as to the unconstitutionality of the act, or, at a minimum, the exemption of the locus from the act.

The Commonwealth moved for summary judgment on its claim that the Blairs had violated the act and on the exemption and constitutionality issues raised in the Blairs' counterclaim. The Blairs moved for summary judgment on the Commonwealth's statutory claim and on their counterclaims. On the statutory claims, the judge determined that the Blairs' alterations amounted to a violation of the act and that the exemptions in the act did not apply to the alterations. The judge found the Blairs' constitutional challenges to the act ripe for adjudication and determined that the act was not facially invalid.[6] As to the Blairs' as-applied takings claims, the judge concluded that no taking under the Fifth Amendment to the United States Constitution occurred because there

[5]See note 11, *infra.*

[6]In their facial challenge to the act's validity, the Blairs argued only that the act deprived them of all economically viable use of their land, not that the act did not "substantially advance legitimate state interests." *Agins* v. *Tiburon,* 447 U.S. 255, 260 (1980). The substance of their facial challenge thus reduces to the question whether the act, by its "mere enactment," *ibid.*, has effected a "categorical" taking. See note 7, *infra.*

was no categorical taking[7] and the act survived the three-prong test of *Penn Cent. Transp. Co.* v. *New York City*, 438 U.S. 104 (1978) (*Penn Central*)[8]; no taking occurred under art. 10 of the Massachusetts Declaration of Rights, as the State constitutional analysis parallels the Federal; and art. 49 of the Amendments to the Massachusetts Constitution provided no independent basis for relief. The judge further determined that the action was not barred by the doctrine of laches and that the act and regulations were not void for vagueness or arbitrariness. Concluding further that the Blairs had not offered any evidence to support their argument that the MDC had applied the act and its exemptions inconsistently or outside the legislative mandate, the judge ordered the Blairs to restore the locus to its pre-alteration condition.

On appeal the Blairs argue that the act is invalid under the Federal and Massachusetts Constitutions; that the Commonwealth's action is barred by laches; and that the act and regulations are void for vagueness.[9]

4. *Analysis.* (a) *Ripeness of the Federal takings claim.*[10] As we have discussed, see notes 6 & 7, *supra*, the Blairs have waived their claim that the act effects a categorical taking of the locus under the Federal Constitution. Unlike the motion judge,

---

[7]A categorical taking may occur when a statute or regulation deprives a landowner of "all economically beneficial use" of her property. *Lopes* v. *Peabody*, 417 Mass. 299, 304 n.9 (1994), quoting from *Lucas* v. *South Carolina Coastal Council*, 505 U.S. 1003 (1992). At oral argument, the Blairs conceded that there was no categorical taking under Federal jurisprudence. However, because of their reading of art. 10 of the Massachusetts Declaration of Rights, the Blairs continue to maintain that there was a categorical taking as defined by Massachusetts law. See discussion, part 4(b), *infra*.

[8]The *Penn Central* analysis considers (1) the economic impact of the government action; (2) the impact on the landowner's reasonable investment-backed expectations; and (3) the character of the government action. 438 U.S. at 124.

[9]There is no merit to the Blairs' void for vagueness argument and we do not consider it further. See generally *Daddario* v. *Cape Cod Commn.*, 56 Mass. App. Ct. 764, 770-772 (2002), cert. denied, 124 S. Ct. 541 (2003).

[10]We note, as did the judge, that the Federal exhaustion doctrine in the context of regulatory takings claims controls the determination of whether we can consider the merits of the Blairs' Federal constitutional claims. See *Daddario* v. *Cape Cod Commn.*, 425 Mass. 411, 414, cert. denied, 522 U.S. 1036 (1997), appeal after remand, 56 Mass. App. Ct. 764, 768-770 (2002), cert. denied, 124 S. Ct. 541 (2003).

we conclude that, because the Blairs failed to utilize the variance provision of the act,[11] their taking claim under the *Penn Central* test, see note 8, *supra*, was not ripe. Generally, a regulatory taking claim is not ripe until "the government entity charged with implementing the regulations has reached a final decision regarding the application of the regulations to the property at issue." *Daddario* v. *Cape Cod Commn.*, 425 Mass. 411, 414, cert. denied, 522 U.S. 1036 (1997), appeal after remand, *Daddario* v. *Cape Cod Commn.*, 56 Mass. App. Ct. 764, 768-770 (2002), cert. denied, 540 U.S. 1005 (2003), quoting from *Williamson County Regional Planning Commn.* v. *Hamilton Bank*, 473 U.S. 172, 186 (1985). See *Wilson* v. *Commonwealth*, 413 Mass. 352, 356 (1992); *FIC Homes of Blackstone, Inc.* v. *Conservation Commn. of Blackstone*, 41 Mass. App. Ct. 681, 690 n.13 (1996). The Supreme Court has stated that "it is impossible to determine the extent of the loss or interference until the [government entity] has decided whether it will grant a variance from the application of the regulations." *Williamson County Regional Planning Commn.* v. *Hamilton Bank*, 473 U.S. at 191 n.12. A final decision is an essential element of a regulatory taking claim:

"It follows from the nature of a regulatory takings claim that an essential prerequisite to its assertion is a final and authoritative determination . . . . A court cannot determine

---

[11]General Laws c. 92, § 107A(*l*), provides, in pertinent part:

"The [agency], in accordance with procedures for notice and a hearing as provided by chapter thirty A, may grant upon appeal or petition with respect to particular uses or structures, and shall grant upon request with respect to crossings of tributaries and bordering vegetated wetlands a *variance* from the provisions of this section where the [agency] specifically finds that owing to circumstances relating to the soil conditions, slope, or topography of the land affected by such uses or structures, desirable relief may be granted without substantial detriment to the public good and without impairing the quality of water in the watersheds. The [agency] shall issue regulations pursuant to section one hundred and eight regarding such proceedings. The division may impose reasonable conditions, safeguards and limitations to any variance as it may find desirable in its sole discretion which, based upon such hearing record, are necessary to protect the water in the watersheds." (Emphasis supplied.)

whether a regulation has gone 'too far' unless it knows how far the regulation goes."

*MacDonald, Sommer & Frates* v. *County of Yolo,* 477 U.S. 340, 348 (1986).

In *Palazzolo* v. *Rhode Island,* 533 U.S. 606, 620-621 (2001), the Supreme Court recently affirmed the Federal requirements for ripeness:

> "Under our ripeness rules a takings claim based on a law or regulation which is alleged to go too far in burdening property depends upon the landowner's first having followed reasonable and necessary steps to allow regulatory agencies to exercise their full discretion in considering development plans for the property, including the opportunity to grant any variances or waivers allowed by law. As a general rule, until these ordinary processes have been followed the extent of the restriction on property is not known and a regulatory taking has not yet been established."

In essence, a claim is not ripe until the landowner has exhausted available administrative remedies and the agency has made a final decision. Because the agency has not made a final determination, on a variance application, of the extent of allowed alteration, the Blairs' as-applied taking claim was not ripe.

The motion judge equated enforcement with a permit denial, ruling that the Commonwealth's enforcement action constituted a final determination of the act's requirements. While this might be true in some circumstances, see, e.g., the "futility exception" to the exhaustion requirement, *Daddario* v. *Cape Cod Commn.,* 56 Mass. App. Ct. at 770, and cases cited, it is not the case here. The enforcement action at issue here did not necessarily indicate what the agency's final determination would be after considering a variance application and applying the variance regulations to the locus.

As provided for in G. L. c. 92, § 107A(*l*), the variance process gives landowners an opportunity to rebut the statutory presumption that alterations in the waterfront area would be harmful to drinking water quality. Before granting or denying a

variance allowing some or all of the proposed alterations, the agency is to consider several factors, including possible mitigating measures. This kind of factual development is not possible where the defendant has simply gone forward without first applying for a variance. Thus, the taking claim is premature. A decision on a variance application, not an enforcement action, would show with finality the extent of the restrictions applied to the locus.

(b) *The art. 10 takings claim.* As the Blairs acknowledge, the Supreme Judicial Court, to date, has evaluated takings claims under the Federal analysis. See *Lovequist* v. *Conservation Commn. of Dennis*, 379 Mass. 7, 19-20 (1979); *Moskow* v. *Commissioner of Envtl. Mgmt.*, 384 Mass. 530, 533 (1981); *Steinbergh* v. *Cambridge*, 413 Mass. 736, 741-744 (1992), cert. denied, 508 U.S. 909 (1993); *Lopes* v. *Peabody*, 417 Mass. 299, 304 (1994); *Daddario* v. *Cape Cod Commn.*, 425 Mass. at 415-418. The Blairs also correctly note that the Supreme Judicial Court has mentioned, without decision, the question whether art. 10 grants a property owner greater protection than the owner has under the Fifth and Fourteenth Amendments to the United States Constitution. See *Lopes, supra* at 300 n.2. That said, the Blairs argue that, under an art. 10 analysis, the act effected a categorical taking of the locus notwithstanding their concession (see note 7, *supra*) that no such taking occurred under the United States Constitution. The crux of the Blairs' argument rests on the text of art. 10.[12] The Blairs urge that we construe the phrase "no part of the property" in art. 10 to mean that, in examining

---

[12]Article 10 provides:

"Each individual of the society has a right to be protected by it in the enjoyment of his life, liberty and property, according to standing laws. He is obliged, consequently, to contribute his share to the expense of this protection . . . . : *but no part of the property* of any individual can, with justice, be taken from him, or applied to public uses, without his own consent, or that of the representative body of the people. In fine, the people of this commonwealth are not controllable by any other laws than those to which their constitutional representative body have given their consent. And whenever the public exigencies require that the property of any individual should be appropriated to public uses, he shall receive a reasonable compensation therefor." (Emphasis supplied.)

the extent of their economic loss, we should consider only that portion of the locus restricted by the act, rather than the locus as a whole. Contrast, e.g., *Moskow* v. *Commissioner of Envtl. Mgmt.*, 384 Mass. at 533.[13] Thus, the Blairs argue, there has been a categorical taking of the portion of the locus that was the subject of the enforcement action.

While this may be an interesting theory,[14] the Blairs' argument is prematurely asserted on the facts of this case. The matter was no more ripe than the Federal taking claim discussed *supra*, due to the Blairs' failure to utilize the variance provision in the act.[15,16]

---

[13]The unit of analysis under the classic takings test, now challenged by the Blairs, was articulated in *Penn Central*: " 'Taking' jurisprudence does not divide a single parcel into discrete segments and attempt to determine whether rights in a particular segment have been entirely abrogated. In deciding whether a particular governmental action has effected a taking, this Court focuses rather . . . on the nature and extent of the interference with rights *in the parcel as a whole*." 438 U.S. at 130-131.

[14]But see *Keystone Bituminous Coal Assn.* v. *DeBenedictis*, 480 U.S. 470, 498 (1987) (rejecting theory advanced in instant matter: "Similarly, under petitioners' theory one could always argue that a setback ordinance requiring that no structure be built within a certain distance from the property line constitutes a taking because the footage represents a distinct segment of property for takings law purposes. Cf. *Gorieb* v. *Fox*, 274 U.S. 603 [1927] [upholding validity of setback ordinance]"); *Slack* v. *Building Inspector of Wellesley*, 262 Mass. 404, 405-406 (1928) (citing *Gorieb* and upholding validity of by-law's setback requirement). Cf. *Commonwealth* v. *Tewksbury*, 11 Met. 55 (1846) (statute barring owner's removal of sand and gravel did not violate art. 10); *Nectow* v. *Cambridge*, 260 Mass. 441 (1927), (upholding validity of zoning ordinance under Massachusetts Constitution and Fourteenth Amendment), rev'd, 277 U.S. 183 (1928) (violation of Fourteenth Amendment).

[15]Even if the Blairs' categorical taking argument is construed as a facial challenge to the act, it fails for failure to exhaust administrative remedies. See, e.g., *Suitum* v. *Tahoe Regional Planning Agency*, 520 U.S. 725, 736 n.10 (1997) ("Such 'facial' challenges to regulation . . . face an 'uphill battle,' *Keystone Bituminous Coal Assn.* v. *DeBenedictis*, 480 U.S. 470, 495 [1987], since it is difficult to demonstrate that ' "mere enactment" ' of a piece of legislation 'deprived [the owner] of economically viable use of [his] property.' *Hodel* v. *Virginia Surface Mining & Reclamation Assn., Inc.*, 452 U.S. 264, 297 [1981]"); *Gilbert* v. *Cambridge*, 932 F.2d 51, 56 (1st Cir.), cert. denied, 502 U.S. 866 (1991) (where statute provides "administrative relief in the form of variances or waivers from the statutory use restrictions," statute could not be facially invalid under takings analysis).

[16]In their supplemental briefs the parties argue the doctrine of primary

(c) *The art. 49 claim.* The Blairs argue that the act fails expressly under art. 49 of the Amendments to the Massachusetts Constitution, as amended by art. 97 of the Amendments.[17] Because the Commonwealth has the constitutional authority, in furtherance of the people's right to a clean environment, to provide for the taking of land (and payment of "just compensation"), the Blairs argue that: (1) the authorization extends to easements; (2) the act specifically authorizes the MDC to expend funds to acquire interests in land; (3) the restrictions of the act upon their land are, effectively, in the "nature of easement"; and (4) they should be compensated therefor.

The judge correctly rejected the argument that the Commonwealth is duty-bound to acquire interests related to the

---

jurisdiction, a matter neither argued below nor considered by the judge. "As a general rule, where an administrative procedure is available, we require a party seeking declaratory relief first to exhaust the opportunities for an administrative remedy." *Balcam* v. *Hingham*, 41 Mass. App. Ct. 260, 266 (1996), quoting from *Space Bldg. Corp.* v. *Commissioner of Rev.*, 413 Mass. 445, 448 (1992), and cases cited. We see no "special circumstances," see *Goldman* v. *Planning Bd. of Burlington*, 347 Mass. 320, 326 (1964), here that would warrant departure from the general rule.

[17]As amended, the text of art. 49 provides:

> "The people shall have the right to clean air and water, freedom from excessive and unnecessary noise, and the natural, scenic, historic, and esthetic qualities of their environment; and the protection of the people in their right to the conservation, development and utilization of the agricultural, mineral, forest, water, air and other natural resources is hereby declared to be a public purpose.
>
> "The general court shall have the power to enact legislation necessary or expedient to protect such rights.
>
> "In the furtherance of the foregoing powers, *the general court shall have the power to provide for the taking, upon payment of just compensation therefor*, or for the acquisition by purchase or otherwise, *of lands and easements* or such other interests therein as may be deemed necessary to accomplish these purposes.
>
> "Lands and easements taken or acquired for such purposes shall not be used for other purposes or otherwise disposed of except by laws enacted by a two thirds vote, taken by yeas and nays, of each branch of the general court." (Emphasis supplied.)

protection of drinking water. The Blairs essentially argue that, because art. 49 authorizes the Commonwealth to acquire "lands and easements" to protect environmental quality, the Commonwealth now may only seek to protect the public interest in environmental quality by means of acquiring property interests, rather than through regulation that stops short of a taking under the Fifth Amendment or art. 10. The Blairs do not cite to authorities supporting their interpretation of art. 49 and, like the Superior Court judge, we find none and refuse to adopt the Blairs' interpretation in the absence of more compelling authority.

(d) *Laches.* The Blairs argue that the Commonwealth's enforcement action should be barred by the equitable doctrine of laches. Their support for this argument is the undisputed fact that John Scannell, a member of the RCC at times relevant to the issuance of its order of conditions under the Wetlands Protection Act, G. L. c. 131, § 40, was at the same time a full-time employee of the MDC. The Blairs argue, in essence, that the MDC had constructive notice of their proposed project and did nothing until a substantial portion of the beach work was done, to their prejudice. We agree with the motion judge, who found no merit to the argument.

First, as matter of law, laches will generally not serve as a bar where a public right is to be enforced. See *Wang* v. *Board of Registration in Med.*, 405 Mass. 15, 20 (1989), citing *Cullen* v. *Building Inspector of N. Attleborough*, 353 Mass. 671, 675 (1968); and *Lincoln* v. *Giles*, 317 Mass. 185, 187 (1944). Second, it is undisputed that most of the land alterations at issue here were performed in the summer of 1997. At the end of July, 1997, the MDC gave verbal notice to the Blairs that the work that was being performed was not in compliance with the act. A writing to the same effect followed on August 27, 1997. The judge was correct in ruling that the Blairs have not met their burden of demonstrating that they were unduly prejudiced by the Commonwealth's timing in bringing this action. An agency must have a reasonable time in which to respond to an apparent statutory violation. The Blairs conducted the work on the locus at their own peril, with prior knowledge that the act

applied to the locus as the result of notice letters sent by the MDC.[18]

5. *Conclusion.* The judgment shall be modified to dismiss the Blairs' counterclaim insofar as it alleged an as-applied taking under the Federal and Massachusetts Constitutions and to declare that the Blairs are not entitled to the relief they seek as to the exemption of the locus from the act and the facial validity of the act and regulations.[19] As so modified, the judgment is affirmed.

*So ordered.*

---

[18]The Blairs alleged that they received letters from the MDC relating to other properties they own that exempted those properties from the requirements of the act, and therefore they reasonably believed that the locus was also exempt. This argument is hardly worth discussion; the act did not posit a general permit or exemption scheme.

[19]See *The St. Paul Cos.* v. *TIG Premier Ins. Co.*, 58 Mass. App. Ct. 650, 657 n.12 (2003) (dismissal is proper disposition where, because of failure to exhaust administrative remedies, party had no right to seek declaration; otherwise, court should ordinarily declare rights of parties when declaratory relief is sought).