SUPERIOR COURT 
 
 COMMONWEALTH OF MASSACHUSETTS v. GRUBHUB HOLDINGS INC. and GRUBHUB INC.

 
 Docket:
 2184CV01719-C
 
 
 Dates:
 March 10, 2023
 
 
 Present:
 Robert B. Gordon Justice of the Superior Court
 
 
 County:
 SUFFOLK, ss.
 

 
 Keywords:
 MEMORANDUM OF DECISION AND ORDER ON COMMONWEALTH'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT
 
 

             Plaintiff, the Commonwealth of Massachusetts (the "Commonwealth"), has brought this action pursuant to G.L. c. 93A, § 4, asserting that Defendants Grubhub Holdings Inc. and Grubhub Inc. (collectively "Grubhub" or the "Defendants") violated Session Law 2020, Chapter 358, § 98 (the "Delivery Fee Cap Statute" or the "Statute"). Before the Court is the Commonwealth's Partial Motion for Summary Judgment as to Liability, by which it seeks a judgment that Grubhub violated the Delivery Fee Cap Statute and G.L. c. 93A, and that Grubhub's various constitutional challenges to the Statute fail as a matter of law. Also before the Court is Grubhub's Cross-Motion for Summary Judgment. After hearing and review, and for the reasons set forth below, the Commonwealth's Motion is ALLOWED and Defendants' Cross- Motion is DENIED.
 
                                                            -1-
 
FACTUAL BACKGROUND [1]
I.          Massachusetts Response to COVID-19 Pandemic
            On March 10, 2020, Governor Baker declared a state of emergency concerning the COVID-19 pandemic. Since that time, "COVID-19 has taken a devastating toll on the Commonwealth, the United States, and the world." Desrosiers v. Governor, 486 Mass. 369,371 (2020). Within months of the declared emergency, the number of COVID-19 infections and deaths "increased at a grim rate." Id. at 373. And during the April, 2020 surge that beset Massachusetts, there were often more than 1,500 infections and 100 deaths per day due to COVID-19. Id. at 371.
            "Against that backdrop, the Governor issued numerous emergency orders, aimed ... to 'flatten the curve,' i.e., to reduce the number of cases at a given time." Id. at 373. These orders, inter alia, banned large gatherings and ordered nonessential businesses to close their physical workspaces and facilities. Id. 373-74. See Gov.'s COVID-19 Order No. 13 (Mar. 23, 2020).[2] Certain services and production sectors, however, were designated as "essential," and were accordingly urged to continue operations during the state of emergency. See Order No. 13. Restaurants and bars were prohibited from offering "on-premises consumption of food or drink;" but they were designated as "essential services" and thus "allowed, and even encouraged, to remain open to offer takeout and delivery services, provided they complied with social distancing requirements." Verveine Corp. v. Strathmore Ins. Co., 489 Mass. 534,537 (2022). See also Order No. 13. Violations of the Governor's orders were punishable by civil fines and
 
-------------------------------------
 
[1] The Factual Background which follows is drawn from the undisputed facts contained in the summary judgment record, together with facts of which judicial notice may properly be taken. Bulwer v. Mount Auburn Hosp., 473 Mass. 672,674(2016); Jarosz v. Palmer, 49 Mass. App. Ct. 834,835 (2000). The Court declines to rule on the Commonwealth's Motion to Strike portions of affidavits which Grubhub has submitted in support of its Opposition and Cross-Motion, as such a ruling is not necessary to resolve the Rule 56 Motions sub judice.
 
[2] Available at https://www.mass.gov/doc/march-23-2020-essentia1-services-and-revised-gatherings-order/download.
 
                                                            -2-
 
criminal penalties, including imprisonment of up to one year. Id.
            "As the public health data improved, the Governor began transitioning the emergency orders to 'reopening[.]"' Desrosiers, 486 Mass. at 374. In June of 2020, for example, restaurants were pennitted to offer outdoor dining and, subsequently, indoor dining at reduced occupancy capacities. See Gov.'s COVID-19 Order No. 37 (June 6, 2020); Gov.'s COVID-19 Order No. 40 (June 19, 2020).[3] Throughout 2020, the Governor issued a series of additional emergency orders, alternately expanding and curtailing the seating capacity, table capacity, and time limits for indoor dining in response to rises and falls in the number of reported COVID-19 cases. Beginning in November of 2020, restaurants were prohibited from offering indoor dining after 9:30 p.m. See Gov.'s COVID-19 Order No. 53 (Nov. 2, 2020).[4] And in December of 2020, indoor dining was reduced from 40% to 25% of a restaurant's seating capacity. See Gov.'s COVID-19 Order No. 59 (Dec. 22, 2020).[5] At that time, Massachusetts had over 300,000 documented cases of COVID-19, resulting in the deaths of more than I0,000 Massachusetts residents. Id.; Desrosiers, 486 Mass. at 371, 379.
II.         Grubhub's Business Model
            Defendants are Delaware corporations headquartered in Chicago, Illinois. Grubhub operates a website, Grubhub.com, and a mobile application (collectively "Grubhub's platforms") which facilitate marketing, takeout orders, and same-day delivery services for restaurants. Grubhub has partnered with over 280,000 restaurants, including some 8,450 restaurants in Massachusetts. Grubhub's competitors include UberEats, DoorDash, and Postmates, businesses which provide similar services and are also incorporated and headquartered outside of
 
-------------------------------------
 
[3] Available at https://www.mass.gov/doc/june-6-2020-phase-ii-reopeniniydownloadand https://www.mass.gov/ doc/reopening-phase-2-step-2-order/download.
 
            [4] Available at https://www.mass.gov/doc/covid-19-order-53-0/download.
 
            [5] Available at https://www.mass.gov/doc/covid-19-order-59/download.
 
                                                            -3-
Massachusetts. Grubhub likewise competes with more traditional, offline methods of takeout ordering, such as restaurants distributing paper menus and receiving telephone orders.
            Customers who place food orders through Grubhub 's  platforms  can, and  predominantly do, pay by credit card or other "noncash" methods - i.e., debit card, PayPal, Venmo, etc. These entities charge fees to Grubhub to process the noncash payments.  Grubhub,  in turn, charges  the end customer for the price of the meal, plus any  applicable  taxes, fees, and  tip. From the customer's payment, Grubhub deducts a commission and additional fees, and then remits the net remainder to the restaurant. Grubhub's commission rate is set  by  contract  with  the  restaurants, and usually ranges between 20% and 30%, depending on the extent  of  the  services a  restaurant has contracted Grubhub to provide. For "noncash" orders, Grubhub charges restaurants  an additional "order processing fee" of 3.05% of the purchase price plus $0.30. Grubhub applies the order processing fee to the  charges it receives  from credit  card companies  and payment processors, as well as to Grubhub's costs for fraudulent and undeliverable orders. Grubhub characterizes the order processing fee as a "pass  through  fee," and  asserts  that  it  approximates the fee that restaurants would pay to a credit card company if a customer placed a noncash order with the restaurant directly. Once a customer places  an  order through  Grubhub,  the  restaurant may not solicit that customer  to  place an order directly with the restaurant  or  through  another third party.
            In its I0-K securities report for the year 2020, Grubhub acknowledged that "the pandemic had a significant, adverse in1pact on [its] restaurant partners, largely due to restrictions on in- restaurant dining, which have contributed to changes in diner behavior." (App. Ex. 3, p. 29.) Nevertheless, Grubhub reported $1.8 billion in revenue, a 39% ($507.8 million) increase over 2019. (App. Ex. 3, p. 29.) For the first quarter of 2021, Grubhub again reported a 52% ($187.6 million) increase in revenue as compared to the first quarter of 2020. (App. Ex. 23, p. 18,
 
                                                            -4-
 
Grubhub 10-Q report, Mar. 31, 2021.) In both reports, Grubhub explained the improved financial trends for the company in the following way:
"The increase ... was primarily as a result of increased product and brand awareness by diners largely driven by accelerated adoption of online food ordering as a result of COVID-19, marketing efforts and word-of-mouth referrals, better restaurant choices for diners in our markets and technology and product improvements. The higher than average order size was primarily driven by changing diner behavior as a result of COVlD-19 including family or group orders....
... While [Grubhub] initially experienced somewhat reduced order volume at the onset of the pandemic during the first quarter of 2020, [it] saw significantly improved trends in subsequent quarters as new diners and new restaurants joined the Platform and existing diners increased ordering as a substitute for in-restaurant dining. These factors contributed to significant increases in Active Diners, Daily Average Grubs and Gross Food Sales on a year-over-year basis."
(App. Ex. 3, pp. 28-29; App. Ex. 23, p. 18.) (emphasis added). In its securities report of March 31, 2021, Grubhub further stated that the increased revenues were "partially offset by a 110 basis point (1.1%) decrease in [its] average revenue capture rate of Gross Food Sales primarily driven by restaurant support programs, including temporary COVID-19 related fee caps and lower restaurant and diner facing fees[.]" (App. Ex. 23, p. 18.) At the same time, however, "[d]elivery expenses increased disproportionally with revenue growth due to the increase in Grubhub-delivered orders in proportion to total orders as well as temporary increase in driver costs due to surging demand, extreme weather in certain markets, and decreased driver availability." (Id.)
III.       The Delivery Fee Cap Statute
            In 2020, several jurisdictions, including Cincinnati, San Francisco, Seattle, and the State of Washington, enacted 15% fee caps on third-party delivery services. (See App. Exs. 13-16.)[6] In May of 2020, the Boston City Council held a hearing to discuss the impact of delive1y fees on
 
-------------------------------------
 
[6] Some of the fee caps were pennanently implemented, while the State of Washington's was enacted only for the duration of the COVID-19 emergency. App. Exs. 13-16.)
 
                                                            -5-
 
restaurants. A representative of Grubhub testified at this hearing in opposition to a proposed delivery fee cap. The City Council did not take further action at the time; but, thereafter, the Massachusetts Legislature enacted the state-wide Delivery Cap Fee Statute, which became effective on January 14, 2021. The Statute provided as follows:
"[N]o third-party delivery service company, from the effective date of this act until the termination of the COVID-19 emergency, shall charge a covered establishment a delivery fee per online order for the use of its services and fees other than a delivery fee that totals more than 15 per cent of the purchase price of the online order. No third-party delivery service company shall reduce the compensation rates paid to the delivery service driver, or garnish gratuities, as a result of this section."
2020 Session Laws, c. 358, § 98(b). "Covered establishments" were defined as restaurants and bars with less than 25 retail locations within Massachusetts, and a "[l]hird-party delivery service company'' was defined as an entity "engaged in facilitating same-day delivery or pickup of food and beverages through a third-party delivery service platform [application, software, website or system] for 20 or more ... covered establishments." 2020 Session Laws, c. 358, § 98(a).
            Following enactment of the Statute, Governor Baker rescinded the 9:30 p.m. curfew for indoor dining, and expanded the restaurant seating capacity limit to 40%. See Gov.'s COVID-19 Order No. 62 (Jan. 25, 2021); Gov.'s COVID-19 Order No. 63 (Feb. 4, 2021). [7] As of March 1, 2021, restaurants were allowed to return to full seating capacity; and on May 21, 2021, all COVID-19 related restrictions on indoor dining were lifted. On June 15, 2021, Governor Baker rescinded the COVID-19 emergency order, and the Delivery Fee Cap Statute ceased to have effect as of that date.
            In response to the Statute, Grubhub adjusted its "commission" to 15% of the customer's purchase price, and informed restaurant partners that it would "charge no more than 15% for [its] services." (Grubhub's Statement of Undisputed Facts (SUF), ,r 60.) However, Grubhub
 
-------------------------------------
 
[7] Available at https://www.mass.gov/doc/covid-19-order-62/download and https://www.mass.gov/doc/covid-l 9- order-63/down load.
 
                                                            -6-
 
continued to charge covered establishments an additional order processing fee of3.05% of the purchase price plus $0.30.
            Two covered establishments, El Jefe's Taqueria[8]   and Felipe's Mexican Taqueria[9], respectively, paid Grubhub approximately $8,200 and $12,000 in order processing fees while the Statute was in effect. On March I, 2021, the owner of El Jefe's contacted Grubhub to complain that Grubhub had charged fees exceeding the statuto1y cap. Grubhub responded that the 15% cap did "not apply to order processing fees." (Id. at ,i 63(f).) In June of 2021, Felipe's owner likewise contacted Grubhub to contest the order processing fees. Grubhub again responded that the fee was exempt from the cap, and that it "comes directly from the credit card companies, and [Grubhub] cannot alter or remove it." (Id. at ,i 64(d).) The Commonwealth's enforcement action followed in due course.
DISCUSSION
I.          Standard of Review
            "Summary judgment is appropriate where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law." Reifman v. Northeastem Univ., 485 Mass. 308,314 (2020) (quoting Godfrey v. Globe Newspaper Co., 457 Mass. 113, 118-19 (2010)). "The moving party bears the burden of demonstrating the absence of a triable issue of fact on every relevant issue," Scholz v. Delp, 473 Mass. 242,249 (2015), and may satisfy this burden by submitting affirmative evidence negating an essential element of the opposing party's case, or by demonstrating that the opposing party has no reasonable expectation of proving an essential element of its case at trial. Flesner v. Technical Commc'ns Corp., 410 Mass. 805, 809
 
-------------------------------------
 
[8] One El Jefe's location (Mount Auburn) first contracted with Grubhub in 2015, agreeing to pay Grubhub 7.5% per order as a marketing fee and a 10% delivery fee. A second location (Boylston St. - Boston) contracted with Gmbhub in 2020; and a third contracted with Grubhub in March of 2021, during the statutory period.
 
[9] Felipe's entered into a contract with in 2019 and agreed to pay 30% per order for Grubhub's services.
 
                                                            -7-
 
(1991); Kourouvacilis v. General Motors Corp.• 410 Mass. 706, 716 (1991). Once the moving party establishes the absence of a triable issue, "the nonmoving party must respond and make specific allegations sufficient to establish a genuine issue of material fact." Barron Chiropractic & Rehab., P.C. v. Norfolk & Dedham Grp.. 469 Mass. 800, 804 (2014). "Bare assertions ... will
not defeat a motion for summary judgment." Id. Accord Mass. R. Civ. P. 56(e).
II.         Violation of Delivery Fee Cap Statute
            Grubhub argues that it is entitled to summary judgment because it did not violate the Delivery Fee Cap Statute. In the alternative, Grubhub argues that the Statute is unconstitutionally void for vagueness, or that the common law rule of lenity excuses Grubhub 's interpretation that order processing fees were exempt from the Statute's coverage. The Court disagrees.
            The Court's "primary duty in interpreting a statute is to effectuate the intent of the Legislature[.]" Williams v. Board of Appeals of Norwell, 490 Mass. 684,690 (2022), quoting Sheehan v. Weaver, 467 Mass. 734, 737 (2014). The "starting point is the statutory text," Commonwealth v. Vega, 449 Mass. 227,230 (2007), which "should be given effect consistent with its plain meaning." Boss v. Leverett, 484 Mass. 553, 557 (2020). The Court will "not interpret the statutory language ... so as to render it or any portion of it meaningless," Williams, 490 Mass. at 690, or lead to an absurd result that would contravene the Legislature's clear intent. Desrosiers, 486 Mass. at 376. For the law to "accomplish its manifest purpose," all of the words used must be given meaning and construed in harmony with each other. Worcester v. College Hill Props., LLC, 465 Mass. 134, 139 (2013).
            In the present case, the Delivery Fee Cap Statute provided as follows:
"[N]o third-party delivery service company, from the effective date of this act until the termination of the COVID-19 emergency, shall charge a covered establishment a delivery fee per online order for the use of its services and fees other than a delivery fee that totals more than 15 per cent of the purchase price of the online order."
2020 Session Laws, c. 358, § 98(b) (emphasis added). Grubhub insists that the Statute
 
                                                            -8-
 
"necessarily excludes" order processing fees, because they are not fees "for the use of Grubhub 's services" but are instead merely "pass through" fees. (Grubhub's Opp., at 5.) Grubhub's argument is manifestly incompatible with the plain language of the Statute.
            The Statute broadly, explicitly, and without exception caps at 15% the total fees a third- party delivery service may charge a covered establishment. Grubhub nonetheless charged restaurants additional order processing fees to "cover[] credit card costs, fraudulent orders and undeliverable orders." (Id. at 6.) These fees, however, are inherently part of Grubhub 's delivery fee for the use of its se1vices. Even assuming, arguendo, that the order processing fee is somehow not part of the "delivery fee ... for the use of its services," the terms of the cap also expressly apply to "fees other than a delivery fee." 2020 Session Laws, c. 358, § 98(b). To rule in Grubhub's favor would require the Court to excise this clause from the Statute, or conclude (implausibly) that an order processing fee is somehow not a fee at all. The Court will neither by fiat render a material clause of the Statute meaningless, nor create from whole cloth an exception for so-called "pass through" charges that simply has no basis in the language of the law. See Steams v. Metro. Life Ins. Co., 481 Mass. 529, 535 (2019) ("[The Court] will not read into [the statute] any exception that the Legislature did not see fit to put there, whether by inadvertence or design.").[10]
            Grubhub 's void for vagueness challenge fares no better. A statute is unduly vague only if it "fails to provide a person of ordinary intelligence fair notice of what is prohibited." Draper v.
 
-------------------------------------
 
[10] Grubhub 's arguments that covered establishments are aware that order processing fees were separate from commissions, and that covered establishmentsare subject to the same fees for direct, noncash orders, are unavailing. That Grubhub may differentiate these fees is irrelevant, because the Statute does not. There is no basis for any distinction along these lines in the text, and such a distinction would undennine the Statute's vety purpose by allowing third-party delivery platforms to pass on to the covered establishments myriad costs above the 15% cumulative cap. Likewise, the fact that the Legislature may have considered but declined to adopt an express exclusion for order processing fees, or that other jurisdictions revised their own statutes after passage to exempt order processing fees, does not support Grubhub's argument for the judicial implication of one, The Legislature was clear in its intent to apply the cap to fees beyond the fee for the delivery itself, and the Statute it enacted does not provide an exception.
 
                                                            -9-
 
Healey. 827 F.3d I, 3 (1st Cir. 2016). "Fair notice" does not require "semantic certainty," and "reasonable breadth in the terms employed by an ordinance does not require that it be invalidated on vagueness grounds." Id. at 4 (quotation omitted). Further, "[t]he test is less strict when the law involves the regulation of business and economic activity and does not inhibit the exercise of constitutionally protected rights." Massachusetts Fed"n ofTchrs., AFT, AFL-CIO v. Board of Educ., 436 Mass. 763, 780 (2002). Similarly, "the rule oflenityrequires [a court] to give a defendant the benefit of any rational doubt where ... a statute is ambiguous or [the court] is
unable to ascertain the intent of the Legislature." Commonwealth v. Rossetti, 489 Mass. 589, 599 (2022) (quotation omitted).
            As set forth above, the Legislature's intent and the language of the Delivery Fee Cap Statute are neither vague nor ambiguous. The Statute is thus not void, and the rule of lenity does not apply.[11]
III.       Violation of G.L. c. 93A
            Having concluded that the Delivery Fee Cap Statute unambiguously includes order processing fees, there is no genuine issue of fact that Grubhub violated Chapter 93A. Section 98(d) of the Statute expressly provides that a violation of the 15% cap "shall be an unfair and deceptive trade practice in violation of chapter 93A[.]" Grubhub charged commissions and fees in excess of 18% of the restaurants' order prices, and thus engaged in unfair and deceptive practices as defined in the law. Grubhub's arguments - that the Commonwealth cannot show that Grubhub had actual or constructive knowledge of wrongdoing or caused damage to the
 
-------------------------------------
 
[11] Because the Statute is unambiguous, Grubhub's  reliance on  Bittnerv.  United States, 538  U.S._, No. 21-1195, 2023 WL 2247233 (U.S. Feb. 28, 2023), to support its rule of lenity argument is unavailing. Moreover, unlike in Bittner, whether or not Grubhub's violation of the Statute was inadvertent, and the extent to which Grubhub may be subject to a penalty for violations of Chapter 93A, are not presently before the Court. Compare id. at *3; with Discussion-Part III, infra. This, too, renders the issue oflenity immaterial for present purposes. Finally, the Court would note that the portion of the Bittner opinion on which Gmbhub relies garnered just two votes of the Justices. See 2023 WL 2247233 at *3, *9 (Gorsuch, J.,joined by Jackson, J.). It is not the law of the land.
 
                                                            -10-
 
restaurants - are unavailing.
            First, G.L. c. 93A, § 4 authorizes the Attorney  General  to bring an action seeking,  inter alia, to restore damages "to any person who has suffered any ascertainable  loss  by reason  of  the use or employment of  such unlawful method, act  or practice [.]" There  is no genuine dispute that El Jefe's and Felipe's suffered economic damage because  ofGrublmb's  violations  of  the Statute. Had Grubhub complied with the Statute, these two entities would have paid just 15% per order to Grubhub. rather than the more costly 18+% per order they did. In total, Grnbhub  collected  more than $20,000 .in excess fees from these two restaurants during the statutory period. [12] Second, scienter is not required to find a violation under c. 93A, § 4, or for the Comt the grant restitution. See Drakopoulos v. United States Bank Nat. Ass'n, 465 Mass. 775,786 n.15 (2013), quoting Maillet v. ATF-Davidson Co., 407 Mass. 185, 193-94 (1990) ("[I]t is not a defense to a c. 93A claim that the defendant's conduct was negligent rather than intentional. Neither intent to engage in an nnlawful act nor knowledge of its unlawfulness is required in order to establish liability."). Scienter only becomes relevant when the Court analyzes whether a defendant's actual or constructive knowledge of wrongdoing justifies civil penalties in the form of a fines, costs, and attorneys' fees. See G.L. c. 93A, § 4.[13]
            The Court finds as a matter of law that Grubhub violated the Statute and G.L. c. 93A.[14]
 
-------------------------------------
 
[12] The fact that the restaurants may have paid similar processing fees to credit card companies for non cash orders they received directly is irrelevant.
 
[13] Any ruling as to the appropriateness of civil penalties would be premature. The Commonwealth has even not moved for such a finding. That said, the Court observes that, while Grubhub has raised issues of fact as to the company's awareness of wrongdoing in this case, its reflexive (and erroneous) denials in response to the restaurants' complaints do not establish, as a matter of law, that it lacked actual or constructive knowledge that its order processing fees violated the Delivery Fee Cap Statute.
 
[14] Grubhub 's aff inn ative defense of laches is likewise rneritless. Laches generally does not barthe ability of a public agency to enforce state law, and an agency is entitled to a reasonable period of time in which to respond to an apparent statutory violation. Commonwealth v. Blair, 60 Mass. App. Ct. 741,751 (2004). Moreover, the undisputed evidence shows that the Office of the Attorney General notified Grubhub in March of 2021 of the Commonwealth's position that Grnbhub was violating the Statute. (App Ex. 87, Aff. Michael Sugar.) Its enforcement actions were not
dilatory.
 
                                                            -11-
 
IV.       Grubhub's Affirmative Constitutional Challenges
            Grubhub advances a scattershot of constitutional challenges to the Delive1y Fee Cap Statute under the Contracts Clause, Due Process/Equal Protection Clauses, Takings Clause, Dormant Commerce Clause, and the Police Power. Grnbhub, of course, bears the burden to prove that the Statute is unconstitutional. Route One Liquors, Inc. v. Secretary of Admin. & Fin., 439 Mass. 111, 115-16 (2003). The Court finds that Grnbhub has failed to do so.
            At the outset, the Court observes that Grnbhub 's constitutional challenges bear a common theme, as well as a consistent omission. Grubhub generally argues that the Statute unjustifiably favors the covered establishments, while substantially impairing Grubhub's contractiial expectations. In so arguing, however, Grnbhub ignores the severe burden that the pre-existing COVID-19 restrictions placed on covered establishments, and the resulting revenue windfall that inured to third-party delivery services. See ante. Indeed, Grubhub does not so much as aclmowledge the overall impact that the COVID-19 restaurant restrictions (and the cmTesponding increase in consumer demand for takeout) had on its business in Massachusetts during the statutmy period. While, as Grubhub emphasizes, the Constitution is not suspended during an emergency, it equally does not require the Comt to view the Statute in a vacuum. "[T]he legislature must be allowed leeway to approach a perceived problem incrementally." F.C.C. v. Beach Commc'ns, Inc., 508 U.S. 307,316 (1993). Stated differently, the legislative and executive branches were not limited to choosing between ignoring a public health emergency or setting the restaurant industry on a path to economic collapse. See Tenniniello v. City of Chicago, 337 U.S. 1, 37 (1949) (Jackson, J., dissenting) (warning that "doctrinaire logic" should not convert the Constitution "into a suicide pact"). The Constitution does not proscribe every statute that has a temporary impact on a business's per transaction profit.
            A. Contracts Clause
 
                                                            -12-
 
            The Contracts Clause of the United States Constitution "restricts the power of States to disrupt contractual arrangements." Sveen v. Melin, 138 S. Ct. 1815, 1821 (2018). To determine whether a law violates the Contracts Clause, courts first consider "whether the state law has 'operated as a substantial impairment of a contractual relationship."' Id. at 1821-22, quoting Allied Structural Steel Co. v. Spannaus. 438 U.S. 234,244 (1978). If so, then the Court must determine "whether the state law is drawn in an 'appropriate' and 'reasonable' way to advance 'a significant and legitimate public purpose."' Sveen, 138 S. Ct. at 1822, quoting Energy Rsrvs. Group, Inc. v. Kansas Power & Light Co., 459 U.S. 400, 411-12 (1983). As explained below, although substantial impairment presents a closer question, the Statute was undeniably a reasonable way to advance a significant and legitimate public purpose. Houlton Citizens' Coal. v. Town of Houlton, 175 F.3d 178,191 (1st Cir. 1999). 
            1. Substantial Impairment
            In evaluating whether a state law substantially impairs a contractual relationship, courts consider the extent to which the law (I) undermines the contractual bargain; (2) interferes with a party's reasonable expectations; and (3) prevents the party from safeguarding or reinstating his rights. Sveen, 138 S. Ct. at 1822. Viewing the Delivery Fee Cap Statute in isolation, these factors appear to favor Grubhub. First, prior to the enactment of the Statute, Grubhub 's contractual commissions were 20%-30% of the purchase orders, plus a more modest order processing fee. By capping these fees at a cumulative 15%, the Statute interfered with Grubhub's contractual arrangements. Second, while the restaurant industry is highly regulated, it appears that jurisdictions only began to regulate third-party delivery platforms in 2020. Thus, the Statute was arguably not a foreseeable interference when Grubhub entered into its contracts with restaurant partners years before. See Baptiste v. Kennealy, 490 F. Supp. 3d 353, 384 (D. Mass. 2020)
 
                                                            -13-
 
(whether parties are operating in a regulated industry is important in detennining whether the regulation was foreseeable). Third, the Statute did not provide a mechanism for Grubhub to recover its full contract rate for transactions consummated during the statutory pe1iod.
            However, when considering these factors within the Conunonwealth's broader response to the COVID-19 pandemic, the analysis is much less favorable to Grubhub 's argument. While the fee cap may not have been reasonably foreseeable, no party anticipated either "a virtually unprecedented event such as the COVID-19 pandemic," Baptiste, 490 F. Supp. 3d at 384, or the resulting restrictions on indoor dining and the heightened demand for Grubhub 's services. Thus, while Grubhub admittedly did not derive its expected profit per order during the statutory period, it did enjoy a spike in business volume during the pandemic that far exceeded any reasonable expectations for revenue growth it held prior to that point. See ante. Additionally, the lower profit per order was tied to the state of emergency and, therefore, the likely period of increased demand. Grubhub was free to return to its customary commission rates once the emergency was lifted, five months later. Thus, the Statute only deprived Grubhub of a fraction of the overall economic benefit it garnered from the pandemic. The matter of "substantial impairment" thus presents a close question, particularly given the relative dearth of evidence on the actual impact of the Statute and other COVID-19 restrictions on Grubhub's revenue from Massachusetts operations.[15] Nonetheless, and for the reasons which follow, summary judgment is appropriate in this case because the Statute was a legitimate exercise of the Legislature's authority. See Houlton, 175 F.3d at 191.
            2. Public Purpose and Reasonableness
            "The requirement of a legitimate public purpose guarantees that the State is exercising its
 
-------------------------------------
 
[15] Grubhub has alluded to expert evidence concerning the impact of whetherGrubhub could have reasonably offset the statutoiy cap with additional fees to customers. As this evidence is not before the Court, the undersigned cannot determine the extent to which it supports a finding of substantial impairment.
 
                                                            -14-
 
police power, rather than providing a benefit to special interests." Energy Rsrvs. Grp., 459 U.S. at 412. "Police power" refers to a State's "exercise of the sovereign right ... to protect the lives, health, morals, comforts, and general welfare of the people." Baptiste, 490 F. Supp. 3d at 386, quoting Local Div. 589, Amalgamated Transit Union v. Massachusetts, 666 F.2d 618,639 (1st Cir. 1981). This "paramount authority ... extends to economic needs as well." Local Div. 589, 666 F.2d at 639. "[W]here, as here, the state is not an interested party [to the contract], courts give deference to the judgment of elected officials as to what is reasonable and appropriate." Baptiste, 490 F. Supp. 3d at 382. Accord Energy Rs1vs., 459 U.S. at 412-13. The Court must "refuse to second-guess" the government's choice of "the most appropriate ways of dealing with the problem[.]" Keystone Bituminous Coal Ass'n v. DeBenedictis, 480 U.S. 470,506 (1987).
            Grubhub argues that the Delivery Fee Cap Statute lacks a significant and legitimate public purpose, because it favors a narrow class. Not true. A cohort comprised of all restaurants in Massachusetts operating fewer than 25 locations plainly does not constitute the type of "narrow" or "favored" class raising Contracts Clause concerns. See DoorDash, Inc. v. San Francisco, No. 21-CV-05502-EMC, 2022 WL 867254 (N.D. Cal. Mar. 23, 2022) (reviewing cases). In DoorDash, the court dismissed a challenge under the Contracts Clause to San Francisco's permanent delivery fee cap of 15%. Id. at *11-16. The court held that a focus on the restaurant industry did not deprive the ordinance of its legitimate public purpose, as a legislature could reasonably target its efforts on practices within a particular industry rather than regulating the broader economy. Id. at* 12, citing CDK Global LLC v. Bmovich, 16 F.4th 1266, 1280-81 (9th Cir. 2021). Likewise, the city ordinance at issue did not impermissibly single out DoorDash, as it "applie[d] to all third-party food delivery services[.]" DoorDash, 2022 WL 867254, at *12.
            The Statute here arises out of and is expressly tied to the pandemic emergency and its negative economic impacts. As noted ante, the Governor issued a series of emergency orders
 
                                                            -15-
 
first prohibiting, and then later substantially limiting, the ability of covered establishments to host indoor dining, in order to reduce the spread and related public health consequences of the COVlD-19 virus. At the same time, however, the emergency orders encouraged restaurants to continue to provide food to the public via delivery or takeout, as designated essential services. These public health measures surely placed financial strains on the covered establishments, jeopardized their financial viability, and increased the risk of other negative sequelae on the local economy - viz., commercial lease defaults, increased unemployment, vacant buildings, and the like.16 For this reason, the Statute served a significant and legitimate public interest by at once promoting public health, as well as the economic well-being of both a broad industry and local communities.
            The Statute also represented a reasonable and appropriate way to advance this purpose. Most notably, it was more limited and narrowly drawn than the ordinance upheld in DoorDash. The Statute shifted a portion of the financial burden of indoor dining restrictions (otherwise borne by restaurants) to third-party delivery platforms (like Grubhub) during the period that correspondingly increased demand for their takeout delivery services was expected to persist.[17] In so doing, the Statute encouraged covered establishments to remain open and thereby continue to provide essential services. Cf. Melendez v. City of New York, 16 F.4th 992, 1033 (2d Cir. 2021) (suspending commercial lease obligations where "there [wa]s no guaranty that such
 
-------------------------------------
 
[16] See Baptiste, 490 F. Supp. 3d at386 (holding that elected officials "had a rational basis" for imposing an eviction moratorium, as they "could have reasonably concluded that . , . many renters were losing their jobs because the COVID-19 pandemic was causing the closing of many businesses ... and evictions, or even the threat of legal action to evict, would displace tenants, cause overcrowding of dwellings and homeless shelters, and result in more people living on the streets"); DoorDash, 2022 WL 867254, at* 13, 15 (noting delivery fee cap served a legitimate public purpose in ensuring that local restaurants remain viable).
 
[17] Grubhub argues that the Statute was not narrowly drawn because it outlasted indoor dining restrictions. However it is not for the Court to determine "the most appropriate ways of dealing with the problem." Keystone, 480 U.S. at 506. Given the dynamic nature of the pandemic, and the repeated experience of loosening and tightening restrictions, it was entirely reasonable for the Legislature to tie the life of the Statute to the state of emergency.
 
                                                            -16-
 
entities will reopen or remain going concerns").
            Grubhub 's challenge to the Statute under the Contracts Clause thus fails as a matter of law.
            B. Due Process and Equal Protection
            Grubhub argues that the Delivery Fee Cap Statute violated constitutional due process because it did "not serve any legitimate public interest and [] prevent[ed] Grubhub from making a fair return on investment." (Grubhub's Opp., at 17.) The record does not support this claim.
            "[T]he Legislature has ample authority to set economic regulations that promote the general welfare," and such regulations are reviewed "under the rational basis test." Kenyon v. Cedeno-Rivera, 47 F.4th 12, 24 (1st Cir. 2022).18 Such statutes are presumptively constitutional, and will only be deemed invalid if they are not rationally related to a legitimate governmental objective. Doherty v. Merck & Co., 892 F.3d 493, 500 (1st Cir. 2018). See Peunell v. San Jose, 485 U.S. I, 11 (1988)("[A] [p]rice control is [only] unconstitutional... if arbitrary, discriminatory, or demonstrably irrelevant to the policy the legislature is free to adopt[.]") (quotations omitted).
            Although Grubhub argues that the Statute forced it "to operate one part of its business at a loss" (see Grubhub's Opp., at 17), it has not put forth probative evidence to support such a claim or otherwise show that that Statute denied the company a reasonable rate of return. See TCF Nat. Bank v. Bemanke, 643 F.3d 1158, 1164 (8th Cir. 20ll)("The heart of any confiscatory-rate claim is the ability to show that the government has set a maximum price for a good or service and that the rate is below the cost of production (factoring in a reasonable rate of
 
-------------------------------------
 
[18] Under the Massachusetts Constitution, in tum,"legisla tion must bear a real and substantial relation to the public health, safety, morals, or s·ome other phase of the general welfare." Chebacco Liquor Mart, Inc. v, Alcoholic Beverages Control Comm'n, 429 Mass. 721, 724 (1999) (quotation omitted). "Any difference between the two constitutiona I standards in the area of economic regulation, however, is narrow[.]" Id.
 
                                                            -17-
 
return) . . . . “);Michigan Bell Tel. Co. v. Engler, 257 F.3d 587,593 (6th Cir. 2001), quoting Federal Power Comm'n v. Hope Natural Gas Co., 320 U.S. 591,605 (1944) ("Rates which enable [a] company to operate successfully, to maintain its financial integrity, to attract capital, and to compensate its investors for the risk assumed certainly cannot be condemned as invalid[.]"). As previously discussed, the Statute here served the legitimate purpose of protecting a local restaurant industry during a time when public health measures impaired a substantial portion of its business activities. See DoorDash, 2022 WL 867254, at *21. The Statute was rationally related to that purpose, in that it promoted the essential service of food delivery by shifting a portion of this financial burden to the very takeout-related entities that benefited from the imposed restrictions.
            Grubhub similarly argues that the Statute violated the Equal Protection Clause because it "irrationally and arbitrarily discriminates against third-party service companies ... while leaving unrestricted all other businesses that transact with restaurants, such as raw ingredient suppliers, equipment suppliers, or advertisers." (Grubhub's Opp., at 17 n.8.) The Court disagrees. An economic regulation does not violate the Equal Protection Clause "if there is any reasonably conceivable state of facts that could provide a rational basis for the classification." Massachusetts Fed'n of Tchrs, 436 Mass. at 777-78 (quotation omitted). Stated otherwise, Grubhub must show that similarly situated entities were treated differently based on irrational criteria. Id. at 778. The record contains no such evidence. As reflected in Grubhub's own business records and public filings, see ante, the Legislature could rationally conclude that third-party delivery services had benefitted from indoor dining restrictions, while restaurants and their suppliers, advertisers, and other vendors had not.[19] Grubhub has thus failed to show that the Statute's focus on third-party
 
-------------------------------------
 
[19] See DoorDash, 2022 WL 867254 at *22 ("[T]he application of the [o]rdinance to third-party platforms but not vendors, such as raw ingredient or equipment suppliers, is rational. Unlike third-partyplatfonns, vendors do not take a fixed-percentage commission out of every sale the restaurant makes.").
 
                                                            -18-
 
delivery platforms reflected arbitrary or irrational discrimination.
            As the Statute was rationally related to a legitimate government interest, and reasonably drawn to serve that interest, Grubhub's affirmative defenses under the Due Process and Equal Protection Clauses fail as a matter of law.
            C. Takings Clause
            The Constitution's Takings Clause states that "private property [shall not] be taken for public use, without just compensation." U.S. Const. amend. V. This constitutional protection is not limited to physical takings, and, in some cases, can apply to an "overly assiduous government regulation." Houlton, 175 F.3d at 190. In evaluating an alleged regulatory taking, courts apply a three-part factual inquiry that considers: (1) the economic impact of the regulation; (2) whether the government action interferes with reasonable investment-backed expectations; and (3) the character of the government action. Philip Morris, Inc. v. Reilly, 312 F.3d 24, 33 (1st Cir. 2002), citing Penn Central Transp. Co. v. City of New York, 438 U.S. 104, 124 (1978). Applying this test, it is evident that Grubhub did not suffer an unconstitutional regulatory taking.
            First, the economic impact of the Delivery Fee Cap Statute amounted to just five months in which Grubhub's commission rates were reduced. After which point, Grubhub was free to reinstate its normal contract terms. See Keystone, 480 U.S. at 497 (the court must "compare the value that has been taken from the property with the value that remains in the property"). Such a temporary deprivation of a portion of Grubhub 's anticipated revenue "does not support a finding that a taking has likely occurred." See Baptiste, 490 F. Supp. 3d at 388 (holding that temporary eviction moratorium which effectively deprived landlords of their contractual right to rent did not support a regulatory taking). See also Tahoe-Sierra Pres. Council. Inc. v. Tahoe Reg'l Plan. Agency, 535 U.S. 302, 332 (2002) (property "cannot be rendered valueless by a temporary
 
                                                            -19-
 
prohibition on economic use, because the property will recover value as soon as the prohibition is lifted").
            Second, as discussed in Part II(A)(l), supra, Grubhub has not shown that the Statute, when considered in the larger context of the COVID-19 restrictions, significantly interfered with Grubhub's reasonable investment-backed expectations. While the Statute temporarily reduced Grubhub's per order profit, Grubhub could not have reasonably expected, at the time it entered into its pre-2020 contracts, that a global pandemic would force restaurants to shift much of their business to takeout and delivery. Grubhub has not presented contrary evidence to account for the dramatically increased volume of business and revenue it experienced during this time frame; and, as such, the record does not reflect the true extent to which the Statute and related COVID- 19 restrictions interfered with Grubhub 's contractual expectations. Thus, the second factor of the regulatory taking analysis is largely neutral.
            As to the final factor, governmental action does not constitute a taking where "interference with the property rights ... arises from a public program that adjusts the benefits and burdens of economic life to promote the common good," and where the government "does not physically invade or permanently appropriate any of the [property] for its own use." Baptiste, 490 F. Supp. 3d at 390, quoting Connolly v. Pension Ben. Guar. Corp.. 475 U.S. 211,225 (1986). The government may "set minimum wages, control prices, or create causes of action that did not previously exist," and the Takings Clause is not "violated whenever the legislation requires one person to use his or her assets for the benefit of another." Connolly, 475 U.S. at 223. Here, the Statute was a public program that "adjust[ed] the benefits and burdens of economic life to promote the common good," and the Commonwealth did not permanently appropriate any
 
                                                            -20-
 
property from Grubhub for the government's own use. Id. at 225.[20]
            Based on these factors, the Court finds that Grubhub has failed as a matter of law to establish a violation of the Takings Clause.
            D. Dormant Commerce Clause
            The "negative" or "donnant" aspect of the Commerce Clause denies States "the power unjustifiably to discriminate against or burden the interstate flow of articles of commerce." Oregon Waste Sys., Inc. v. Department ofEnvt'lOuality, 511 U.S. 93, 98 (1994). This constitutional limitation on government power is not implicated in the case at bar.
            The Delivery Fee Cap Statute's definition of a "third-party delivery platform" did not distinguish between in-state and out-of-state entities. Where, as here, the law is not facially discriminatory, the party challenging the statute must show a discriminatory purpose or effect favoring similarly situated, in-state businesses over their out-of-state counterparts. Alliance of Auto. Mfrs. v. Gwadosky, 430 F.3d 30, 36 (1st Cir. 2005). The only evidence of discriminatory purpose or effect Grubhub has presented is that neither it nor its major competitors are Massachusetts-based companies. This is simply insufficient to meet its burden. Gtubhub has not
 
-------------------------------------
 
[20] Grubhub's reliance  on Washington  Food Indus. Ass'n v. .       No. 99771-3, 2023 WL 1830835 (Wash. Feb. 9, 2023) and DoorDash, 2022 WL 867254, is unavailing. Grubhub argues that the DoorDash court found that the plaintiff had raised a colorable claim under the Takings Clause, and that"[t]he same factual issues are present here." (Grubhub's Opp., at 18.) The DoorDash court, however, merely held that the plaintiff's claim as pleaded survived a Rule 12(b)(6) motion to dismiss. 2022 WL 867254, at *19. Likewise, in Washington Food, the court held that Instacart's Takings and Contracts Clause challenges to an ordil1ance requiring it to provide hazard pay to delivery drivers during the COVID-19 emergency could not be dismissed at the pleadings stage, and "should proceed to discovery to detennine the degree to which Instacart's contracts have been impaired." 2023 WL 1830835, at* 10, *14. While DoorDash and Instacart could rely on plausible allegations to defeat dismissal at the pleading stage, Grubhub - having taken discovery -- has failed to present evidence of a regulatory taking sufficient to suivive summary judgment. Additionally, the municipal ordinances at issue in the aforementioned cases differ materially from the Statute under review in the case at the bar. In Washin!!ton Food, the ordinance precluded Instacart from offsetting "the cost of the imposed regulatory expenses" by increasing customer fees or by limiting the scope of the drivers' work. Id.at *3, *15. The ordinance at issue in DoorDash, in tum,pennanently changed the delivery service's contract rates. 2022 WL 867254, at* 18. The Statute in the present case, by contrast, suspended excess delivery fees for just five months, and did not preclude Grubhub from offsetting its costs. Lastly, Grubhub's reliance on First Eng. Evangelical Lutheran Church of Glendale v. Los Angeles, 482 U.S. 304 (1987), is also misplaced, and for the same reason, as that case merely held that "'temporary' takings which ... deny a landowner all use of his propert)', are not different ... from pennanent takings[.]" Id. al 318 (emphasis added).
 
                                                            -21-
 
identified anything in the legislative history indicating that the Commonwealth passed the Statute with the purpose of discriminating against out-of-state businesses, see id. at 37; and Grubhub has not identified any "similarly situated" in-state businesses that were not made subject to the same
requirements of the legislation. See Family Winemakers ofCalifomia v. Jenkins, 592 F.3d I, 10 (1st Cir. 2010).
            A statute that operates evenhandedly to implement a legitimate local interest is valid, so long as the burden it imposes on interstate conunerce is not "clearly excessive in relation to the putative local benefits." Wine & Spirits Retailers, Inc. v. Rhode Island, 481 F.3d I, 11 (1st Cir. 2007), quoting Pike v. Bruce Church, Inc., 397 U.S. 137, 142 (1970). As discussed ante, the Statute served a legitimate public interest by providing covered establishments with a modicum of financial relief, promoting their continued viability, and reducing the risk of harm to local economies from widespread restaurant closures. To the extent there is an incidental burden visited upon interstate commerce, it arises because a handful of out-of-state entities apparently control nearly all of the third-party delivery market. See S.F. Police Code § 5300(d) (noting that four third-party delivery service platforms control approximately 98% of the market).  However, "the Commerce Clause is not meant to be a safety net for individual out-of-state entities, but rather to prevent burdening the interstate market as a whole." Perfect Puppy, Inc. v. East Providence, 98 F. Supp. 3d 408,417 (D.R.I. 2015), quoting Pharmaceutical Care Mgmt. Ass'n v. Rowe, 429 F.3d 294,313 (1st Cir. 2005).
            Grubhub has failed to show a clearly excessive impact on interstate commerce relative to the Statute's putative benefits. The Commonwealth is entitled to judgment on Grubhub's dormant Commerce Clause defense.
            E. Police Power
            Finally, Grubhub argues that the Delivery Fee Cap Statute exceeded the
 
                                                            -22-
 
Commonwealth's police power. The Legislature exceeds the police power only when the enacted law has "no substantial relationship to the public health, safety, or general welfare." Durand v. JDC Bellingham, LLC, 440 Mass. 45, 52 (2003). As the court aptly held in DoorDash, the allegations that the Legislature "exceeded its police power" in enacting the delivery fee cap law "are implausible." 2022 WL 867254, at *20. As in DoorDash, the Statute had "a legitimate purpose-to protect the restaurant industry-and its means [were] reasonable and appropriate." Id. Grubhub's police power challenge thus fails as a matter of law.
CONCLUSION  AND ORDER
            For the reasons stated above, Plaintiff's Motion for Partial Summary Judgment as to Liability is ALLOWED and Defendants' Cross-Motion for Summary Judgment is DENIED.
 
SO ORDERED.